EUGENE McGRATH v. JUDD BROWN AND ANOTHER.[1]

August 5, 1938.

No. 31,593.

*Moonan & Moonan,* for relator.

*Reynolds & McLeod,* for respondents.

[1]Reported in 281 N. W. 73.

HOLT, JUSTICE.

*Certiorari* to review an award of the industrial commission.

May 12, 1936, relator in the course of his employment was kicked while unharnessing a horse of the respondent employer. Disabling injuries resulted. The employer and his insurer recognized liability under the terms of the workmen's compensation act and voluntarily paid for relator's hospitalization, medical care, and weekly compensation until June 14, 1936, then ceased. No notice was given of discontinuance of payments as provided by 1 Mason Minn. St. 1927, § 4295. In December, 1936, relator filed a petition for further compensation for disability and medical treatment. Respondents answered. A hearing before a referee was had, and additional compensation was awarded up to July 20, 1936. Relator appealed to the commission. It approved and adopted as its own the findings of fact of the referee and affirmed his order.

Relator's assignments of error are numerous, but the argument relating thereto is divided into two parts. The first challenges the findings of fact that the disability resulting from relator's accidental injury terminated on July 20, 1936; and that relator sustained no permanent disability as a result of the accident. These two findings, if sustained by the evidence, determine the case. For if relator had fully recovered from the result of the accident on July 20, 1936, he was not entitled either to compensation for any period after that date or to medical attention subsequently rendered. Relator, 62 years old, was working as a teamster for respondent Brown, engaged in road construction work. The team which relator was driving and caring for consisted of three horses. As he went to unharness one of the horses he received a vicious kick. He claims that he fell down, was trampled on, and crushed against the manger. He was removed to a hospital, where his chest was taped, and one of his ears, badly torn or lacerated, was bandaged. After a stay of five days in bed he was up and around in the hospital and was discharged therefrom about May 25, 1936. At his request and for his convenience, he was permitted by respondents to engage the services of Dr. Kemp of Mankato to attend him. Dr.

Kemp considered that there was a full recovery on June 14. Indeed, the doctor treated only the ear, and testified that relator never referred to any other injury from the accident, except that on June 1 he complained of pain in the movement of his arms.

It is conceded that relator is afflicted with hypertrophic arthritis of the spine. The medical testimony indicates that a traumatic injury, such as relator received, is likely to aggravate or light up the arthritis. The doctors who testified are not agreed as to the duration of the result of an accidental injury to one suffering from hypertrophic arthritis. From the findings it is evident that the industrial commission concluded that, whether the accident lighted up or aggravated the arthritis which now causes his disability, the effect thereof had subsided or passed off so that on July 20, 1936, relator was in the same condition he would have been had he not experienced the accident. Relator's counsel makes much of some discord in the testimony of two of respondents' medical experts, one giving the opinion that relator's hypertrophic arthritis was due to a low-grade infection, and the other that no infection was related to "this particular case." From the medical experts it may be gathered that the cause of arthritis and hypertrophic arthritis is not as yet established to any degree of certainty in the medical profession. At any rate, relator, when he suffered the accident, had a spine which had for some time been afflicted with hypertrophic arthritis, a progressive affliction often accompanying advancing age, and it was for the commission to determine to what extent and during what period the accident affected the diseased spine so as to cause disability to do his customary work. One of the medical experts expressed the thought that the accident made relator conscious of the arthritic condition of his back, which had theretofore escaped his notice, and so his counsel suggest that when an accidental injury, even though physically healed, has indirectly affected other functions of the body, and is thus disabling, compensation should be awarded, as in cases of neurosis in Welchlin v. Fairmont Railway Motors, 180 Minn. 411, 230 N. W. 897; Rystedt v. Minneapolis-Moline Power Imp. Co. 186 Minn. 185, 242 N. W. 623; Sigley

v. Marathon Razor Blade Co. Inc. 111 N. J. L. 25, 166 A. 518. In each of these cases the evidence showed the accident produced the disabling neurosis. There was no claim in the instant case that relator suffered from neurosis or that the accident caused any neurotic disability. We think the commission's findings above referred to are sufficiently supported by the evidence and must be sustained.

Relator contends that because there was no notice of discontinuance of weekly payments as provided by 1 Mason Minn. St. 1927, § 4295, he was as a matter of law entitled to compensation up until the time of the hearing of the petition herein. That contention was not made before the referee or the commission. But we regard it as without merit. The statute mentioned contains the provision that "until such notice is given, and such reports filed, as aforesaid, the liability for and the making of such payments shall continue unless otherwise ordered by the Commission." Here, on relator's petition, the commission took jurisdiction, received evidence and fully heard the matter of respondents' right to stop paying compensation, decreeing that payment should cease as of July 20, 1936.

The second part of relator's assignments of error (Nos. 10 to 23, inclusive) go to the referee's rulings with regard to the admission of evidence. There was no objection to Dr. Evans' testimony that from the history of the case as obtained by him and his examination of relator in September he was of the opinion that relator had no "residuals" from the effect of the accident of May 12, longer than up to about July 20. There is no good reason to be found in the record for discrediting the expert medical opinion of Dr. Evans, and the commission had a perfect right to give credence thereto.

Error is claimed in the exclusion or striking out of certain answers in the testimony of relator's lay witnesses, Kopp, Smith, and Lystahl. Kopp, a neighbor of relator who had worked with him, testified as to various kinds of work he had seen relator do prior to the time he was injured, and was permitted to testify, over respondents' objection, that he never saw him experience any difficulty in doing his work up to that time. But relator desired

to go further and got the witness to say that relator was not able to hoe some corn he had planted. On motion of respondents the answer was stricken as a mere conclusion. Various answers of the same sort were stricken, then the following took place:

Q. "Did you observe him trying to hoe the corn?

A. "Yes.

Q. "How long a period of time did it take him?

A. "It was all summer and the corn got too big and it could not be hoed any more and he had to quit.

Q. "And what was there about his appearance when he was trying to do this work that you came to your conclusion that he was weak?

A. "The way he acted.

Q. "How did he act?

A. "He was walking around kind of stooped like and weak looking."

A motion to strike the quoted part of the record was denied. This permitted what was competent of Kopp's testimony regarding relator's appearance and ability to come into the record. There were like rulings when the witness Smith testified that he thought relator was not able to walk home. The witness Lystahl testified that he was plastering for relator, who tried to assist him, but that relator was unable to carry a pail of mortar and was told to let it go, that witness would do it. Then this question was asked:

Q. "What was there about it when he tried to lift the pail of mortar?

A. "It seemed like it was his back, I couldn't tell."

The answer was stricken as conclusion on respondents' motion. Thereupon this occurred:

Q. "Did you look at him, the way he looked when he tried to lift that, was there about him something that made you notice it?

A. "I looked at him and he said—

Q. "Not what he said, but what you saw about him?

A. "I couldn't really say much about that. He was not white in his face or anything of that kind, but he could not lift the pail."

The answer was stricken as conclusion and this question asked:

Q. "Anyway, you saw him make an effort to lift it?

A. "He tried to.

Q. "But he did not lift it?

A. "He could not do it."

There was no motion to strike this last testimony; and, on cross-examination, after eliciting that the witness estimated the weight of the mortar to be ten pounds, this question was asked:

Q. "You saw him reach over to take hold of that pail and then he did not lift it?

A. "Yes."

It is apparent that no error of which relator may complain was made in respect to Lystahl's testimony. We think there was no violation of the rules of evidence approved in Bannister v. George H. Hurd Realty Co. 131 Minn. 448, 155 N. W. 627, cited by relator, nor out of harmony with Gartner v. Mohan, 41 S. D. 406, 170 N. W. 640, or United States v. Woltman, 61 App. D. C. 52, 57 F. (2d) 418, or the text in 22 C. J. 618, *et seq.*, also cited by relator.

Our conclusion is that the evidence sufficiently supports the determinative findings of fact and that no error in the admitting or rejecting of testimony was made.

The decision of the commission is affirmed and the writ discharged.

Mr. Chief Justice Gallagher took no part in the consideration or decision of this case.